Dear Mr. Purpera:
Your request for an Attorney General's Opinion has been assigned to me for research and reply. You have asked for our office's opinion on matters related to the Horsemen's Benevolent and Protective Association ("HBPA"). Specifically, you ask whether funds realized from dedicated percentages of pari-mutuel wagering and other gaming revenues generated at horse racing and off-track wagering facilities that are statutorily required to be paid to the HBPA are public or private funds.
According to your request, Act 630 of the 2010 Regular Session enacted La.Rev.Stat. 4:185.1, which requires the Louisiana Legislative Auditor, at the direction of the Legislative Audit Advisory Council, to audit the HBPA and its operations and programs. You indicate that certain questions have arisen pursuant to this expansion of oversight. These questions involve the nature of the HBPA, the role it plays in the statutory scheme of gaming in Louisiana, and the character of the funds that are dedicated to its control and use for the benefit of horsemen.
At issue are four (4) separate streams of revenue that flow to the benefit of the HBPA. You state that all streams of revenue are derived from gaming revenue in the form of mandatory fees set aside for purse supplements. Your opinion request identifies and labels the four (4) streams of revenue as follows: 1) PariMutuel Wagering, 2) Slots at the Track, 3) Video Poker at Off-Track Wagering Facilities, and 4) Off-Track Wagering. You ask for our opinion as to whether each of these four (4) streams of revenue are properly classified as public funds under Louisiana law. *Page 2 
Pari-mutuel wagering or betting is defined as a system of gambling in which bets placed on a race are pooled together and then paid, less a management fee and taxes, to those holding winning tickets.[1] La.Rev.Stat. 4:183 provides that fifty percent (50%) of the track owner's take for each race, minus all fees and purse supplements, is to be used for purse supplements.[2] Four percent (4%) of this amount is dedicated to the HBPA for the use and benefit of horsemen.
SLOTS AT THE TRACK
La.Rev.Stat. 27:361 provides that as a condition of licensing and in order to maintain its authority to conduct slot machine gaming at a licensed eligible facility, owners of the facility are required to annually pay a fixed percentage of fifteen percent (15%) of the annual net slot machine proceeds received from slot machine gaming operations to support horse racing facilities by supplementing purses. Seventy percent (70%) of this amount goes to supplement purses for thoroughbred races, with four percent (4%) of this seventy percent (70%) going to the HBPA.[3] The other thirty percent (30%) goes to quarter horse races, with four percent (4%) of this thirty percent (30%) also going to the HBPA.[4]
VIDEO POKER AT OFF-TRACK WAGERING FACILITIES
La.Rev.Stat. 27:318 requires owners of licensed establishments to pay twenty percent (20%) of the net device revenue to supplement purses. Pursuant to subparagraph B(4) of this statute, four percent (4%) of the mandatory twenty percent (20%) is dedicated to the HBPA for the use and benefit of horsemen.
OFF-TRACK WAGERING
La.Rev.Stat. 4:217(D)(1)(d) provides that two percent (2%) of the commissions from wagers placed pursuant to the provisions of La.Rev.Stat. 4:216(C) at off-track wagering facilities are dedicated to the HBPA to be used for the benefit of horsemen.
At the outset, we note that none of the statutory provisions referenced above includes a definition of public funds, nor do any of them contain a declaration that the monies dedicated to the HPBA are public funds. Thus, we must determine whether the funds at issue are of the same type and nature as those *Page 3 
customarily considered public funds under Louisiana law. The Louisiana Supreme Court decision in Property Insurance Associationof Louisiana v. Theriot, 2009-1152 (La. 3/16/10),31 So.3d 1012 ("Theriot") provides some guidance on this issue.
In Theriot, the issue before the Court was whether the Property Insurance Association of Louisiana ("PIAL") was a public or private entity. In its analysis, the Louisiana Supreme Court specified and referenced four (4) factors which determine an entity's public or private character. These factors are (1) whether the entity was created by the legislature, (2) whether its powers were specifically defined by the legislature, (3) whether the property of the entity belongs to the public, and (4) whether the entity's functions are exclusively of a public character and performed solely for the public benefit. State v. Smith,357 So.2d 505 (La. 1978). The third factor, whether the property of the entity belongs to the public, is of particular relevance to the question presented herein.
With respect to the third factor, the Theriot Court stated:
 La.R.S. 22:1460(E) mandates that all fire insurance companies licensed to operate in Louisiana must belong to PIAL and pay levies to PIAL "equitably in proportion to the services rendered by the association to the individual member." Further, for a period of time ending in 2008, PIAL contractually provided administrative services to Citizens, which receives public funding, on a costreimbursement basis. LLA argues that because PIAL's source of revenue is guaranteed by state law through mandatory assessments on its members, and because PIAL received public money through its contractual relationships with Citizens and LAIP, PIAL's property belongs to the public.
 PIAL disagrees, contending that it does not receive any public funding. PIAL asserts that the member assessments are private money paid by private companies to a private association, and that this private money does not become public money simply because the assessments are guaranteed by state law. PIAL further argues that being paid for services by contract with public funds does not make a contracting party public. We agree. Theriot, 31 So.3d at 1018-1019.
The Court recognized that the statute in question required that PIAL's "expenses . . . shall be paid by its members and subscribers through assessments levied upon them by the association . . . [and] [t]he association shall have the right to charge subscribers for services rendered, and to charge members and *Page 4 
subscribers reasonable entrance and annual membership and subscription fees." Theriot, 310 So.2d at 1019; citing
La.R.S. 22:1460(E)(1). The Court observed that these assessments, charges, and fees were paid by private parties directly to PIAL. Further, these funds were not paid to, or from the state general fund, and any excess funds would be returned to the members/subscribers and not paid into the general fund. As such, the Court implicitly concluded that such monies were not
public funds.
This office has also previously addressed the issue of whether certain funds are properly classified as public funds. In Attorney General Opinion No. 09-0156, we noted that the Legislature, in various statutes, has defined public funds as "any funds obtained from legislative appropriation or any form of state or local taxation."[5] We also stated the following:
 In addition to these other laws, the Louisiana Supreme Court General Administrative Rules, Part G, § 1 (a) (ii) similarly asserts that the phrase "public funds" means legislatively appropriated funds, judicial expense funds, self-generated funds, funds of federal, state, local, parish or municipal governments, and any other sources of public funds. Black's Law Dictionary (8th ed. 2004) defines "public funds" as "[t]he revenue or money of a governmental body" or "[t]he securities of a state or national government."
In our view, the generally prevailing meaning of the term public funds include those funds or monies that are either obtained from legislative appropriation or any state or local taxation; judicial expense funds; funds self-generated by governmental units; other funds of federal, state, local, parish or municipal governments; and any other funds or monies derived from public funds. However, pursuant to the Louisiana Supreme Court decision in Theriot, the mere fact that certain assessments are guaranteed by statute would not transform otherwise private funds into public funds.
Turning now to the question presented, each of the four (4) revenue streams of revenue cited above is derived from a specific Louisiana statute. In each instance, as an integral part of the State's pervasive regulation of the horse racing industry, the legislature has directed certain entities to pay a certain amount of specific revenue streams to the HBPA in order to aid and benefit horsemen in the State of Louisiana in delineated ways. In our view, such government-directed funds are properly classified as public funds, as being akin to a legislative appropriation. *Page 5 
Our conclusion is supported by the role and function the HBPA plays in the gaming and horse racing industry. As recognized in Attorney General Opinion No. 08-0318, the HBPA is a private non-profit corporation. Nevertheless, we opined that the Louisiana State Racing Commission, by virtue of the broad delegation of power from the Legislature to regulate and oversee the business of horse racing, has direct regulatory oversight and adjudicatory authority over the HBPA as it relates to horse racing. Further, the Louisiana State Racing Commission also has regulatory jurisdiction over racetracks and their operators regarding money earned at a racetrack and statutorily dedicated to the horsemen as purse money. Still further, our conclusion is supported by the explicit language found in La.Rev.Stat. 4:141 regarding monies used to advance horse racing in the State of Louisiana. La.Rev.Stat. 4:141 provides that in furtherance of the State's responsibility to provide revenues for the operation of state government for its people, "the providing of funds and financial assistance to licensed horse racing tracks in the State constitutes an authorized public function and purpose of the State of Louisiana."
Our office finds a distinction between monies that are "guaranteed" by statute as in Theriot, and monies that are specifically set aside and directed to a particular entity by statute for particular purposes of a pervasively regulated industry. In Theriot, the Louisiana Supreme Court held that "private money does not become public money simply because the assessments are guaranteed by state law." As referenced above, the state law in question was La.Rev.Stat. 22:1460 (E) which mandates that all fire insurance companies licensed to operate in Louisiana must belong to PIAL and pay levies to PIAL. The statute further requires that such payments must be paid "equitably in proportion to the services rendered by the association to the individual member."
Stated differently, state law mandates that if a particular fire insurance company is licensed and operating in Louisiana, that company must pay unto to PIAL a certain amount that is equivalent to its proportionate share of the services received by that company from PIAL. Such a concept is somewhat similar to the general legal principles of unjust enrichment and quantum meruit, where an entity receives services and/or a benefit and is required to pay or compensate the provider of such services or benefit. The mere fact that such a concept is "guaranteed" or otherwise provided for by a particular statute should have no effect on the proper classification of the monies exchanged between the parties. However, in our view, the legislation giving rise to the four (4) revenue streams flowing to the HBPA are different from a simple "guarantee," or a simple affirmation of the legal principles of unjust enrichment and/or quantum meruit.
In each instance, the legislature has directed a certain percentage of a certain pool of money be transferred to the HBPA. A review of the statutes at issue fails *Page 6 
to reveal any sort of consideration or benefits received by the individuals who pay into the certain pools of money. In fact, it appears that absolutely no consideration at all is received by those individuals who actually pay into the pools of money. The contributing entities receive no consideration in the form of services provided by the HPBA or otherwise in exchange for the monies directed to the HBPA. Also, there is apparently no correlation between whether the individuals who pay into the certain pools of money are either regulated by the HBPA, or receive services or a benefit from the HBPA and the requirement that the mandatory contributions be made to the HBPA. In essence, it appears that the Legislature has simply dictated that a certain percentage of pari-mutuel and certain gaming revenues is to be set aside and directed to the HBPA to fund the public interest work delegated by the state to the HBPA. We believe such factors distinguish the HBPA scenario from the insurance industry scenario discussed in Theriot.
Accordingly, it is our opinion that the funds in question are properly classified as public funds. In our view, funds received by an entity, which is subject to the direct regulatory oversight and adjudicatory authority of a public agency, pursuant to and solely because of a legislative directive and in furtherance of a public function and purpose are properly classified as "public funds."
We trust this adequately responds to your request. However, if our office can be of further assistance, please do not hesitate to contact us.
 Very truly yours,
 JAMES D. "BUDDY" CALDWELL ATTORNEY GENERAL
 By: __________________________ MICHAEL J. VALLAN Assistant Attorney General
 JDC/MJV/chb
[1] Black's Legal Dictionary, 9th Ed.
[2] See also La.Rev.Stat. 4:217.
[3] La.Rev.Stat. 27:361(B)(4)(a)(i).
[4] La.Rev.Stat. 27:361(B)(4)(a)(ii).
[5] La.Rev.Stat. 34:3102, La.Rev.Stat. 34: 3492.